UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ERIC FELECE CURRY,

    Plaintiff,

v.                                                             CASE NO. 3:19-CV-371-J-MAP

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.
_____/

## **ORDER**

This is an appeal of the administrative denial of disability insurance benefits (DIB) and period of disability benefits.[1] *See* 42 U.S.C. § 405(g). Plaintiff argues the administrative law judge (ALJ) erred by posing a hypothetical question to the vocational expert (VE) that did not include all of Plaintiff's impairments. After considering the parties' arguments (doc. 17, 20) and the administrative record, I find the Commissioner's decision is supported by substantial evidence. I affirm.

    *A.*     *Background*

Plaintiff Eric Curry, 47 years old on the date of his most recent administrative hearing, alleges that injuries he sustained during his seven-year career as a defensive end in the NFL disabled him as of January 1, 2007. (R. 847, 851) After graduating from the University of Alabama with a degree in criminal justice, he was a first-round pick in the 1993 NFL draft. (R. 859) Over the course of his career, he played for the Green Bay Packers, the Tampa Bay Buccaneers, and the Jacksonville Jaguars. Plaintiff left the NFL in 2001, after a series of injuries. In March 2012, the

---

[1] The parties have consented to my jurisdiction. *See* 28 U.S.C. § 636(c).

NFL awarded him total and permanent disability benefits of approximately $10,000 per month. (R. 860)

In the meantime, Plaintiff filed for DIB in February 2012, alleging disability due to the same football-related injuries: post-concussion syndrome, memory loss, depression, sleep apnea, uncontrolled diabetes, tinnitus, headaches, hypertension, and degenerative joint disease in his fingers, back, neck, shoulders, chest, hips, and knees. The Commissioner denied this application. (*See* R. 13-29) Plaintiff appealed, and the District Court reversed and remanded, directing the Commissioner to "reconsider the medical opinions in the record (including all those rendered in connection with claims for worker's compensation and other non-SSA benefits), specify the weight given to each opinion, and clearly explain the reasons for the selected weight; (2) if necessary, revisit findings concerning whether Curry's head trauma and related issues are severe impairments; (3) if necessary, revisit findings concerning Curry's credibility; and (4) take any other appropriate action." (R. 918)

As instructed, the Appeals Council vacated the first ALJ's opinion and remanded the case for proceedings consistent with the District Court's order. After a second administrative hearing before another ALJ, the Commissioner again denied Plaintiff's application. (R. 640-54) This time, the AC affirmed. This case is Plaintiff's appeal of the second ALJ's denial.

Plaintiff is married with four young children. (R. 850) Since leaving the NFL in 2001, Plaintiff has worked on and off as a personal trainer, a volunteer assistant football coach at his children's school, and a longshoreman. (R. 853-56) Plaintiff's date of last insured (DLI) is March 31, 2010 (R. 642); Plaintiff must establish he was disabled by his DLI to receive benefits. In other words, the second ALJ's task was to determine – in 2017 – whether Plaintiff became disabled at some point between January 1, 2007, and March 31, 2010. The ALJ acknowledged the difficulty

of this at the hearing: "We're talking about his condition ten years ago. With a date last insured – I've got the transcript from the other one [the first administrative hearing in 2013]. I'm going to use most of what he was testifying to. Because I mean – it's hard for anyone to expect you to remember what you were doing ten years ago." (R. 862)

After a second hearing, the ALJ found that Plaintiff suffers from the severe impairments of degenerative disc disease of the lumbar and cervical spine; generalized osteoarthritis of the bilateral shoulders, hands, knees, and right ankle; history of a right ACL tear and hand deformities from a history of fractures; slight carpal tunnel syndrome of the right wrist; and post-concussion syndrome. (R. 642-43) The ALJ also acknowledged Plaintiff's 2014 diagnosis of "mild neurocognitive disorder due to traumatic brain injury or a major neurocognitive disorder due to probable Alzheimer's disease." (R. 643) This condition "is characterized by progressive worsening of cognitive functioning," and Plaintiff "experienced significant decline between 2014 and 2016." (*Id.*) According to the ALJ, however, "through the date last insured of March 31, 2010, the objective evidence does not document the presence of a neurocognitive disorder." (*Id.*)

The ALJ determined that, before March 31, 2010, Plaintiff was not disabled, because he retained the RFC to perform a range of light work:

> The claimant has the ability to lift/carry and push/pull 20 pounds occasionally and 10 pounds frequently; sit for four hours at a time and a total of eight hours during an eight hour day; stand and/or walk for two hours at a time and a total of six hours during an eight hour day; occasionally climb ladders, stairs, and ramps; occasionally balance, stoop, kneel, crouch and crawl; frequently, but not more, handle and finger for fine and gross manipulation bilaterally; no limitations regarding vision, or communication; no environmental limitations; unable to perform complex tasks but could perform simple, routine tasks consistent with unskilled work with concentration on those tasks for two-hour periods with normal breaks and a lunch.

(R. 644) The ALJ found that, with this RFC, Plaintiff obviously could not perform his past relevant work as a professional football player but could work as an electrical accessories assembler, a

3

marker, or a route clerk. (R. 653) The AC denied review. Plaintiff, after exhausting his administrative remedies, filed this action.

      *B.*     *Standard of Review*

To be entitled to DIB, a claimant must be unable to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(d)(1)(A). A "'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *See* 42 U.S.C. § 423(d)(3).

The Social Security Administration, to regularize the adjudicative process, promulgated detailed regulations. These regulations establish a "sequential evaluation process" to determine if a claimant is disabled. *See* 20 C.F.R. § 404.1520. If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a)(4). Under this process, the Commissioner must determine, in sequence, the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment(s) (*i.e.*, one that significantly limits his ability to perform work-related functions); (3) whether the severe impairment meets or equals the medical criteria of Appendix 1, 20 C.F.R. Part 404, Subpart P; (4) considering the Commissioner's determination of claimant's RFC, whether the claimant can perform his past relevant work; and (5) if the claimant cannot perform the tasks required of his prior work, the ALJ must decide if the claimant can do other work in the national economy in view of his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4).

A claimant is entitled to benefits only if unable to perform other work. *See Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); 20 C.F.R. § 404.1520(f), (g).

In reviewing the ALJ's findings, this Court must ask if substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The ALJ's factual findings are conclusive if "substantial evidence consisting of relevant evidence as a reasonable person would accept as adequate to support a conclusion exists." *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citation and quotations omitted). The Court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds the evidence preponderates against the ALJ's decision. *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Keeton*, 21 F.3d at 1066 (citations omitted).

    C.    *Discussion*

        1.    *Hypothetical Question to the Vocational Expert*

Plaintiff advances one argument: the ALJ erred by posing a hypothetical question to the VE that did not include all of Plaintiff's impairments, specifically his limitations on reaching, handling, and fingering due to shoulder impingement and his inability to make a fist (Doc. 17 at 10). The Commissioner responds that "[s]ubstantial evidence supports the ALJ's assessment of Plaintiff's RFC, and the ALJ's hypothetical question to the VE included all the limitations in the ALJ's RFC finding." (Doc. 20 at 7) It follows that "[t]he ALJ, therefore, properly relied on the VE's testimony to find that Plaintiff could perform other work through his date last insured." (*Id.*) I agree with the Commissioner.

To be sure, an ALJ must pose an accurate hypothetical that accounts for all the claimant's impairments. *Wind v. Barnhart,* 133 F. App'x 684, 694 (11th Cir. 2005); *Pendley v. Heckler,* 767 F.2d 1561, 1563 (11th Cir. 1985). The ALJ's hypothetical must also comprehensively describe the plaintiff's limitations. *Pendley*, 77 F.2d at 1563. But the hypothetical need not include "each and every symptom of the claimant." *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1270 (11th Cir. 2007). Instead, the ALJ must include those limitations he finds credible. *See Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996) (ALJ is not required to include limitations found not credible in hypothetical to VE; he submits to the expert only those supported by objective evidence of record).

As Plaintiff concedes, this case is unusual, because at issue is Plaintiff's medical condition leading up to his March 2010 DLI (Doc. 17 at 8). Also unusual is that all the medical records are from physicians who evaluated but did not treat Plaintiff, and all the records are related to his worker's compensation claim against the NFL. At least four doctors evaluated Plaintiff before his DLI: orthopedic surgeon Michael Einbund, M.D. (October 2006); neurologist Robert Rose, M.D. (October 2006); orthopedic surgeon Theodore Levine, M.D. (June 2007); and neurologist Harriet Cokely, M.D. (June 2007).[2] Apart from these evaluations, Plaintiff did not seek treatment or medical care during the relevant time period and managed his pain with over-the-counter medication. (R. 649)

Dr. Einbund completed a Qualified Medical Evaluation (QME) of Plaintiff in October 2006, at the request of Plaintiff's counsel in his case against the NFL, when Plaintiff was 36 years

---

[2] Four physicians examined (but did not treat) Plaintiff after his March 2010 DLI: orthopedist David Apple, M.D. (January 2012), neuropsychologists Dr. Vanderploeg (February 2012) and David Hebda, M.D. (May 2014), and neurologist Jon Peters, M.D. (May 2014) . Most of these evaluations addressed the decline of Plaintiff's cognitive abilities, including his dementia diagnosis.

old.  Dr. Einbund's QME included a physical examination of Plaintiff, an interview with him regarding his injuries, and a review of his medical records.  In a preamble, in which he described Plaintiff's past job as "an extremely violent occupation," Dr. Einbund paints a picture of the what Plaintiff endured playing football:

> Over the years, while playing professional football, the patient experienced pain, discomfort, soreness, and numbness in his head, shoulders, shoulder blades, elbows, hands/fingers, wrists, back, hips, hamstrings, and ankles. He . . . was required to constantly grip, grasp, push, and pull players, jerseys and helmets, catch and throw a football, reach below, at, and above shoulder level, constantly extend his arms, strike his elbows and hands/fingers against the ground, helmets, and footballs. . . . He was also subjected to constant stress and constant collisions with other players and the ground during the eight years he played professional football. He also experienced headaches, nightmares, blurry vision, loss of hearing, loss of sleep, hot palpitations, and irritation of his stomach due to the constant collisions with other players, the stress, and due to the large amount of medication he had to take.

(R. 332-33)  Although Dr. Einbund examined Plaintiff to determine his whole body impairment rating, relevant here are his observations of Plaintiff's upper extremity limitations.  Dr. Einbund noted Plaintiff (who is 6 feet, 6 inches tall and weighed 275 pounds post-retirement), had a full range of motion in both shoulders, wrists, and hands but a restricted range of motion in his elbows and the fingers of both hands. (R. 336)  Images of Plaintiff's bilateral wrists and hands revealed "a healed fracture of the 3rd metacarpal on the left with screws in place.  There are no obvious degenerative changes." (R. 339)  Dr. Einbund assessed Plaintiff's elbow pain as "being frequent and slight which becomes moderate with repetitive gripping and grasping." (R. 343)  His bilateral hand and wrist pain was "constant and slight which becomes moderate with repetitive gripping and grasping." (*Id.*)

Dr. Einbund concluded Plaintiff could not return to his job as an NFL player and, "[w]ith regard to his shoulders, he should avoid repetitive work above-shoulder-level.  With regard to his elbows, wrists and hands, he should *avoid repetitive gripping and grasping*." (R. 343) (emphasis

7

added) He assigned Plaintiff with a whole person impairment of 38%. Then, after examining later-obtained MRIs of Plaintiff's cervical and lumbar spine and left shoulder, Dr. Einbund amended his conclusions in July 2007, to recommend Plaintiff undergo bilateral shoulder decompression and lumbar injections and follow-up with a spine specialist. (R. 328) He wrote, "the remainder of my opinions and recommendations remain unchanged from those as noted in my October 3, 2006 report." (*Id*).

Additionally, in October 2008 (two years after his initial report), Dr. Einbund completed a check-the-box form indicating that he reviewed the duties required of a Professional Sales Representative and it "would be a physically appropriate occupation for [Plaintiff], as per the description submitted." (R. 200) According to the description provided to Dr. Einbund, a Professional Sales Representative makes calls and meets with clients, completes miscellaneous paperwork, tracks clients through record keeping, and keeps track of inventory. (R. 201) The "Handling/Touching" portion of the job description states the job requires no grip strength; pinch power "when hand writing on a frequent basis;" gross handling ability "when carrying promotional packages or office supplies;" and fine manipulation skills "on a minimal basis." (R. 203)

The ALJ summarized Dr. Einbund's October 2006 QME, his July 2007 update, and his October 2008 statement that Plaintiff could perform the duties of a Professional Sales Representative, and he assigned Dr. Einbund's opinions "partial weight." Specifically, although Dr. Einbund determined Plaintiff should avoid repetitive work above shoulder level, repetitive gripping and grasping, and prolonged standing and walking, he did not define what he meant by "repetitive" and "prolonged." (R. 650) The ALJ continued:

> Further, Dr. Einbund indicated the claimant could perform the jobs of a professional sales representative which, among other activities requires frequent handwriting, gross handling abilities, and fine manipulation, a finding which seems inconsistent with no repetitive gripping and grasping. Dr. Einbund's objective findings are also

8

inconsistent with the more recent examination performed by Dr. Levine with Dr. Levine specifically noting that he was unable to substantiate many of Dr. Einbund's findings.

(R. 650)

The ALJ compared Dr. Einbund's October 2006 QME with the QME performed by orthopedic surgeon Dr. Levine in June 2007, at the request of the NFL's lawyers. (R. 447) Dr. Levine assessed a whole body impairment rating of 1% and recorded Plaintiff's comments that he enjoys playing golf and basketball and exercises regularly. (R. 450) Regarding Plaintiff hands, Dr. Levine noted "evidence of residua of trauma to multiple digits," with a loss of five degrees of extension in at least two of his fingers. (R. 451-52) Also, according to Dr. Levine, Plaintiff "is able to make a full and tight fist. There is no atrophy of the interossei with good strength in the interossei. Grip strength testing with the Jamar Dynamometer reveals a best of three of 100 bilaterally." (R. 452)

Dr. Levine's report included his review of Dr. Einbund's QME, which had occurred a year earlier. (R. 461) Dr. Levine states:

> In the reporting of Dr. Michael Einbund of October 3, 2006, Dr. Einbund offers many diagnoses which I am unable to substantiate at the time of this evaluation. A claim of difficulty with urination and with bathing himself is not referenced by Mr. Curry. He offered no complaints referable to his hearing or to his speaking and, in fact, during the course of the evaluation, I could not appreciate that there was any difficulty with seeing, hearing, or speaking. I could not find any basis for Dr. Einbund stating that Mr. Curry was having difficulty with standing and climbing stairs.

(R. 464) The ALJ pointed out that Dr. Levine's examination of Plaintiff occurred after the amended disability onset date and that Dr. Levine found "significantly greater abilities than those identified by Dr. Einbund." (R. 651)

Notably, Plaintiff does not challenge the relative weight the ALJ assigns to the orthopedists' conflicting opinions. Instead, he limits his challenge to the ALJ's hypothetical

question to the VE. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education level, and vocational background "capable of light work as defined in the regulations" with corresponding postural limitations and "[m]anipulative wise, for this first hypothetical, assume no more than frequent reaching in all directions bilaterally and no more than *frequent handling and fingering bilaterally as for fine and gross manipulation . . . .*" (R. 891) (emphasis added). The VE responded that this hypothetical individual could not return to work as a football player but could work as an assembler of electrical accessories, a marker, or a route clerk. (R. 891-92)

Plaintiff argues there is no substantial evidentiary support for the ALJ's finding that Plaintiff can perform frequent reaching, handling, and fingering, and his hypothetical question does not account for Dr. Einbund's findings that Plaintiff could not repetitively grip or grasp anything (Doc. 17 at 14). The ALJ based his hypothetical, in part, on Dr. Einbund's endorsement of the Professional Sales Representative job as an occupation Plaintiff can perform. According to the ALJ, that job requires "frequent handwriting, gross handling abilities, and fine manipulation." (R. 650) Plaintiff contends this is wrong: the job actually requires only "minimal" fine manipulation and requires gross handling only when "carrying promotional packages or office supplies," which would occur only "occasionally" and would not exceed six pounds (doc. 17 at 11).

Unfortunately for Plaintiff, his argument is not the smoking gun he thinks it is. Dr. Einbund endorsed a job for Plaintiff that requires some fine manipulation and gross handling while at the same time finding Plaintiff could not repetitively grip or grasp. Meanwhile, Dr. Levine found Plaintiff had good grip strength. The ALJ weighed these opinions, among others, and fashioned a hypothetical question that included frequent reaching, handling, and fingering – limitations he

10

found supported by substantial evidence. The VE identified three jobs (assembler of electrical accessories, marker, and route clerk) within this RFC, excluding Professional Sales Representative. Notably, neither Dr. Einbund nor Dr. Levine was a treating source (and again, Plaintiff does not dispute the weight the ALJ assigned to the medical opinions). Against this backdrop, the ALJ's hypothetical included those limitations he found credible after reviewing the available medical evidence up to Plaintiff's DLI, and those limitations have substantial evidentiary support.

At this point in my analysis, I reiterate that, when reviewing an ALJ's decision, my job is to determine whether the administrative record contains enough evidence to support the ALJ's factual findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, ___ U.S. ___; 139 S.Ct. 1148, 1154 (2019). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Id.* In other words, I am not permitted to reweigh the evidence or substitute my own judgment for that of the ALJ even if I find the evidence preponderates against the ALJ's decision. *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Considering this, there is substantial evidentiary support for the ALJ's decision that Plaintiff could perform light duty work prior to March 31, 2010.

   *D.   Conclusion*

   For the reasons stated above, it is ORDERED:

      (1) The ALJ's decision is AFFIRMED; and

(2) The Clerk of Court is directed to enter judgment for Defendant and close the case.

DONE and ORDERED in Tampa, Florida on March 13, 2020.

*Mark A. Pizzo*
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE